UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>KYLE PETERSEN | No. 3:16-cr-109 (SRU) |

**ORDER**

On April 26, 2017, Petersen pleaded guilty (pursuant to a plea agreement) to Count One of an indictment charging him with conspiracy to distribute, and to possess with intent to distribute, 400 grams or more of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. *See* Indictment, Doc. No. 18; Min. Entry, Doc. No. 192; Plea Agreement, Doc. No. 193.[1] On July 19, 2017, I held a sentencing hearing and sentenced Petersen to 10 years' imprisonment (the mandatory minimum) and five years' supervised release. *See* Min. Entry, Doc. No. 255; Judgment, Doc. No. 293 (entered on Sept. 8, 2017). Petersen is currently housed at the Federal Correctional Institution, Danbury ("FCI Danbury"). *See Find an Inmate*, FED. BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited Dec. 3, 2020). Petersen's scheduled release date is November 24, 2024. *See id.* Petersen has thus served about four-and-a-half years in prison, accounting for good time credit. That is approximately half of his sentence.

On September 10, 2020, Petersen (through counsel) filed a motion for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), as amended in 2018 by the First Step Act. *See* Mot. for Release, Doc. No. 387. Petersen contends that "extraordinary and compelling

---

[1] In pleading guilty, Petersen stipulated that the quantity of fentanyl involved in this case was 2.5 kilograms. *See* Plea Agreement, Doc. No. 193, at 3; PSR, Doc. No. 253, at ¶ 19.

circumstances" warrant his release.  Petersen's Mem. of Law in Supp. Mot. for Release ("Petersen's Mem. of Law"), Doc. No. 387-1, at 1.  More specifically, Petersen seeks release based on "(a) the growing COVID-19 pandemic, which is especially dangerous in the confines of correctional institutions, (b) Mr. Petersen's hypertension, and (c) the § 3553(a) factors as applied in his case."  *Id.*  Petersen also filed relevant medical records.  *See* Mot. to Seal, Doc. No. 391; Petersen's Medical Records, Doc. No. 392.  On September 22, the government filed an opposition.  *See* Gov't Opp'n, Doc. No. 388.  The government argues that Petersen has not established extraordinary and compelling reasons warranting his release because Petersen's hypertension does not, under the circumstances, "rise[] to the level required for compassionate release."  Gov't Opp'n, Doc. No. 388, at 9.  The government also argues that the sentencing factors under 18 U.S.C. § 3553(a) "weigh heavily against release."  *Id.* at 20.  On October 2, 2020, Petersen filed a reply.  *See* Reply, Doc. No. 390.  For the following reasons, I **deny** Petersen's motion for release.

## I.      Standard of Review

The First Step Act of 2018 (the "FSA") amended the language of section 3582(c)(1)(A). Before the FSA, only the Director of the Bureau of Prisons (the "BOP") could make a motion for the court to reduce a defendant's sentence based on extraordinary and compelling reasons.  It is widely acknowledged that the BOP fell short in its gatekeeper role and that, as a result, too few inmates were granted compassionate release.  *See, e.g.*, U.S. Dep't of Justice, Office of the Inspector General, Evaluation and Inspections Division, *The Federal Bureau of Prisons' Compassionate Release Program* i (April 2013), https://oig.justice.gov/reports/2013/e1306.pdf ("[W]e found that the existing BOP compassionate release program has been poorly managed and implemented inconsistently, likely resulting in eligible inmates not being considered for

release and in terminally ill inmates dying before their requests were decided."); Shon Hopwood, *Second Looks & Second Chances*, 41 CARDOZO L. REV. 83, 105–06 (2019); William W. Berry III, *Extraordinary and Compelling: A Re-Examination of the Justifications for Compassionate Release*, 68 MD. L. REV. 850, 868 (2009) (noting that, in the 1990s, 0.01 percent of inmates annually were granted compassionate release).

Congress passed the FSA against that backdrop. The FSA altered section 3582(c)(1)(A), in part, to increase the use of compassionate release. *See* 164 Cong. Rec. H10358 (daily ed. Dec. 20, 2018) (titling changes to section 3582(c)(1)(A) as "Increasing the Use and Transparency of Compassionate Release"). In particular, the FSA amended section 3582(c)(1)(A) to allow a defendant him- or herself to bring a motion for compassionate release. Section 3582(c) now reads, in relevant part:

> (c) Modification of an imposed term of imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that – (1) in any case –
>
> > (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that –
> >
> > > (i)  extraordinary and compelling reasons warrant such a reduction; . . .
> >
> > and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Until recently, I (and many other district courts around the country) interpreted the "applicable policy statement[] issued by the Sentencing Commission" to be U.S.S.G. § 1B1.13. *See, e.g.*,

*United States v. Almontes*, 2020 WL 1812713, at *2 (D. Conn. Apr. 9, 2020).  Section 1B1.13 reads, in relevant part:

> Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—
>
> (1)
>    (A) Extraordinary and compelling reasons warrant the reduction; or
>
>    (B) The defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;
>
> (2) The defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
>
> (3) The reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13.

Two application notes to section 1B1.13 further elucidate the meaning of "extraordinary and compelling reasons."  Application note three provides, simply, that rehabilitation of a defendant "is not, by itself, an extraordinary and compelling reason for purposes of this policy statement."  U.S.S.G. § 1B1.13 cmt. n.3 (citing 28 U.S.C. § 994(t)).  Application note one sets forth three specific examples of "extraordinary and compelling reasons" and also one catch-all provision.  The first example explains that an inmate's medical condition rises to the level of an extraordinary and compelling reason when the inmate is suffering from a terminal illness or some other serious condition that "substantially diminishes" that inmate's ability to provide self-care within the prison.  U.S.S.G. § 1B1.13 cmt. n.1(A).  The other two specific examples in application note one regard defendants over the age of 65 (U.S.S.G. § 1B1.13 cmt. n.1(B)) and situations in which an inmate may be needed to care for his children or his spouse/partner (U.S.S.G. § 1B1.13 cmt. n.1(C)).  *See id.*  The catch-all provision, titled "Other Reasons,"

provides that extraordinary and compelling reasons also exist when, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 cmt. n.1(D).

The Sentencing Commission has not amended section 1B1.13 since Congress passed the FSA. Indeed, it could not because a quorum of the Sentencing Commission still does not exist. As a result, some anachronisms within section 1B1.13 are in tension with the FSA. In particular, two clauses in section 1B1.13—including the catch-all provision at U.S.S.G. § 1B1.13 cmt. n.1(D)—still require that the Director of the BOP be the one to bring a motion for relief under section 3582(c)(1)(A). Of course, though, the FSA altered section 3582(c)(1)(A) directly and eliminated that requirement by allowing a defendant him- or herself to bring such a motion under certain circumstances. In part for that reason, the Second Circuit has recently held that section 1B1.13 is *not applicable* to compassionate release motions brought by defendants themselves. *See United States v. Brooker*, 976 F.3d 228, 236 (2d Cir. 2020). Because in this case Petersen himself made a motion for compassionate release, I may "consider the full slate of extraordinary and compelling reasons," and nothing in the "now-outdated version" of section 1B1.13 limits my discretion. *Id.* at 237.

In granting motions for reductions in sentence under section 3582(c)(1)(A) that are based on the threat posed by COVID-19, courts within this circuit and across the country have concluded that "extraordinary and compelling" reasons for release may exist when an incarcerated defendant suffers from health conditions or other infirmities that make him particularly susceptible to serious complications should he contract COVID-19. *See, e.g.*, *United States v. Colvin*, 451 F. Supp. 3d 237, 241 (D. Conn. 2020).

The defendant bears the burden of proving that he is entitled to a sentence reduction. *See United States v. Morales*, 2020 WL 2097630, at *2 (D. Conn. May 1, 2020). Courts "have broad discretion in deciding whether to grant or deny a motion for a sentence reduction." *United States v. Jones*, 2020 WL 2782395, at *2 (D. Conn. May 29, 2020) (quoting *United States v. Tagliaferri*, 2019 WL 6307494, at *3 (S.D.N.Y. Nov. 25, 2019)) (cleaned up). Indeed, section 3582(c)(1)(A) grants a district court permissive authority to reduce an inmate's sentence under certain conditions. *See* 18 U.S.C. § 3582(c)(1)(A) ("[T]he court . . . *may* reduce the term of imprisonment . . . ."). A court may not reduce a term of imprisonment without "considering the factors set forth in section 3553(a) to the extent that they are applicable." *Id.*; *see also United States v. Torres*, 464 F. Supp. 3d 651, 658 (S.D.N.Y. 2020) (explaining that courts must consider section 3553(a) factors before granting a sentence reduction pursuant to section 3582(c)(1)(A)).

**II. Discussion**

A. Background

On May 19, 2016, law enforcement officers arrested Petersen. *See* PSR, Doc. No. 253, at ¶ 5. The same day, law enforcement officers executed a search warrant at Petersen's parents' home in New Britain, Connecticut. *See id.* at ¶ 15. There, officers found over $738,000 in cash, approximately 3.2 kilograms of MDMA, and 50,000 pills of Xanax. *See id.* Petersen's arrest followed a nearly six-month investigation into his (and his co-defendants') drug trafficking activities. *See id.* at ¶¶ 7–16. That investigation included the use of a confidential source, who conducted several controlled purchases, and a wiretap. *See id.* The investigation revealed that Petersen's "relevant conduct in the conspiracy involved 2.5 kilograms of fentanyl, 3.2 kilograms of MDMA, 12.5 grams (2500 5mg) oxycodone pills, and 50,000 units of a Schedule IV

controlled substance (Xanax)." *Id.* at ¶ 16; *see also* Plea Agreement, Doc. No. 193, at 3 (drug quantity stipulation).

Petersen grew up in a difficult environment. His parents "regularly smoked marijuana and his father suffered with an alcohol addiction." PSR, Doc. No. 253, at ¶ 45. Petersen's parents largely neglected Petersen. *Id.* Nor were Petersen's older siblings positive role models: They were "in and out of incarceration" when Petersen was growing up. *Id.* at ¶ 46. Petersen himself was "in and out of various juvenile detention centers" between the ages of 11 and 15. *Id.*[2] Petersen used drugs throughout his adolescence. He first consumed alcohol when he was 12, and he was drinking daily by 18. *See id.* at ¶ 53. Petersen first smoked marijuana when he was 11. *See id.* By the time he was 15, Petersen was smoking three "blunts" every day; at the time of his arrest in this case, Petersen was smoking 12 "blunts" per day. *Id.* Petersen used crack cocaine occasionally between the ages of 18 and 23. *Id.* Since the age of 16, Petersen used ecstasy weekly. *Id.* In the years before his arrest in this case, Petersen also took prescription opiates and Xanax whenever available. *Id.* at ¶ 54. Petersen does not have an extensive criminal history. At the time of sentencing, Petersen was in criminal history category II. *See id.* at ¶ 39. Between 2004 (age 18) and 2016 (his arrest in this case), Petersen had four adult criminal convictions. Two were for possession of marijuana. In total, Petersen had been incarcerated for approximately four months. *See id.* at ¶¶ 35, 37.[3]

---

[2] Petersen "was detained in the Hartford Juvenile Detention Center . . . approximately 12 times," spent approximately one year at the Waterford Juvenile Detention Center, was at the Connecticut Junior Republic Detention Center for approximately nine months, and was detained at the Long Lane School for approximately two years. PSR, Doc. No. 253, at ¶ 46.

[3] Although in state court in 2012 Petersen was arrested for (and convicted of) possession with intent to sell and sentenced to 3 years' incarceration, Petersen has not served any of that sentence because Petersen appealed his conviction. That conviction was vacated in 2014 but reinstated in September 2016, which was after he had been arrested in this case. *See* PSR, Doc. No. 253, at ¶ 37. As I discussed at sentencing, it will be up to the state court judge whether Petersen's sentence will run concurrently or consecutively to the sentence I imposed in this case. *See* Tr. of Sentencing Hr'g, Doc. No. 317, at 17:6–24:13.

Petersen started selling drugs around 2005, when he was 20 years old. *See id.* at ¶¶ 47, 91. Petersen trafficked drugs because doing so was lucrative. He noted in his presentence interview with an officer from the United States Probation Office: "I took care of three households, my own, my parents['], and my sister's." *Id.* at ¶ 19. Petersen claims that he "planned to stop selling drugs in October 2016 because I had enough money to sustain, but I got arrested in May 2016." *Id.* In fact, Petersen reported: "It seems like I am better in here, being that I don't have the burden of taking care of my parents and my sister[,] who is a single parent." *Id.* at ¶ 57. Petersen further elaborated:

> They have to step up and take care of themselves. I feel like they are a part of the reason I am in here. I've had to support my parents' household for the last five years after my father retired. They were going to lose their home and I helped them pay their mortgage and taxes monthly until I got arrested.

*Id.* Petersen indicated that "he also helped his sister purchase school clothing and basic necessities for her children." *Id.*

Despite all that, Petersen has shown significant promise. For instance, Petersen managed to obtain his GED in 2007. *See id.* at ¶ 60. Petersen also attended a tractor training school in 2010 and 2011 and earned his commercial driver's license. *See id.* at ¶¶ 47, 60. Further, Petersen reported that he "earned a certificate for applying chemical pesticides for landscaping companies in 2010." *Id.* at ¶ 60. Indeed, Petersen worked at two different landscaping companies between 2007 and his arrest in this case. *Id.* at ¶ 61. But, even though Petersen had a history of some lawful employment, "he sold drugs all throughout his employment history" because "I knew I could make more money selling drugs than working jobs." *Id.* at ¶ 65.

At the time of sentencing, Petersen faced a mandatory minimum of 10 years' imprisonment and a maximum of life imprisonment. *See id.* at ¶ 71. Petersen's Guidelines range was 121-to-151 months' imprisonment. *See id.* at ¶ 72. Both Petersen and the government

8

agreed that a ten-year sentence was sufficient in this case. *See* Plea Agreement, Doc. No. 193, at 5 ("[T]he Government agrees that it will not seek a term of imprisonment greater than 120 months."); Tr. of Sentencing Hr'g ("Sentencing Tr."), Doc. No. 317, at 24:20–21 ("The government seems to agree that the mandatory minimum is sufficient."). I agreed with the parties that a ten-year sentence was sufficient to comply with the purposes of sentencing.

Still, at Petersen's sentencing, I made some comments that are relevant to the resolution of the instant motion. I remarked: "I do want to just make the point that needs to be said here, and that is what you did was very, very serious." Sentencing Tr., Doc. No. 317, at 24:23–25. I noted that fentanyl is contributing to a public health crisis in Connecticut, and so "we need to get this drug off the street, and we need to get people who are dealing in this drug into prison serving significant sentences." *Id.* at 25:8–11. I explained that a sentence much longer than the mandatory minimum would not be appropriate "because you haven't served significant sentences in the past, and this ought to be an incremental punishment over what you've done in the past." *Id.* at 25:20–23. But, I was troubled by "the length of time over which you were involved in drug-dealing of one sort or another," which was evidenced by the amount of cash that was stashed in Petersen's parents' home. *Id.* at 26:2–6. I wanted Petersen to "walk away from today realizing that what you did was a very serious crime." *Id.* at 25:14–15.

B. Parties' Arguments[4]

Petersen argues that the status of COVID-19 in prisons generally, combined with his hypertension, puts him "at high risk for severe illness or death from COVID-19." *See* Petersen's Mem. of Law, Doc. No. 387-1, at 7–15. Petersen points to courts that have granted compassionate release to defendants who suffered from hypertension, "even without co-

---

[4] The parties agree that Petersen has satisfied section 3582(c)(1)(A)'s exhaustion requirement. *See* Petersen's Mem. of Law, Doc. No. 387-1, at 20; Gov't Opp'n, Doc. No. 388, at 8.

occurring conditions." *Id.* at 14 (citing *United States v. Salvagno*, No. 5:02-cr-51-LEK, Doc. No. 1166 (N.D.N.Y. Apr. 23, 2020); *United States v. Sawicz*, 2020 WL 1815851 (E.D.N.Y. Apr. 10, 2020); *United States v. Soto*, 2020 WL 2104787 (D. Mass. May 1, 2020); *United States v. Scparta*, 2020 WL 1910481, at *9 (S.D.N.Y. Apr. 20, 2020); *Basank v. Decker*, 2020 WL 1481503, at *3 (S.D.N.Y. Mar. 26, 2020); *United States v. Pena*, 2020 WL 2301199, at *4 (S.D.N.Y. May 8, 2020); *United States v. Robinson*, 2020 WL 4041436 (E.D. Va. July 17, 2020)). Petersen notes that although "his hypertension has only recently manifested itself [in August 2020], it does not make it any less dangerous." *See* Reply, Doc. No. 390, at 1; PSR, Doc. No. 253, at ¶ 52 (omitting mention of any chronic conditions and noting that Petersen was "not prescribed any medication"); *see also* Petersen's Medical Records, Doc. No. 392-2, at 3 (diagnosis of "[e]ssential (primary) hypertension" on Aug. 25, 2020). And Petersen reports that, since diagnosis, "his condition has worsened," "his blood pressure readings have increased," and "the prescribed dosage of medication to control his condition has recently doubled." Reply, Doc. No. 390, at 1.[5]

Petersen also argues that, pursuant to section 3553(a), the time he has already served is sufficient to comply with the purposes of sentencing. One reason is because his original sentence "did not account for months of lockdown, restricted movement, and extreme fear of illness and death." Petersen's Mem. of Law, Doc. No. 387-1, at 16. Thus, "[t]he time he has served since March 2020 . . . has been significantly harsher than what the Court likely anticipated at the time of sentencing." *Id.* Petersen urges that "[t]o properly calibrate just punishment for Mr. Petersen's offense, the Court should account for these new conditions of

---

[5] I am unable to corroborate Petersen's claim in his medical records. *See* Petersen's Medical Records, Doc. No. 392 (detailing no encounters later than Aug. 25, 2020, which is when Petersen was apparently first diagnosed with hypertension). However, I do note that Petersen's medical records indicate that Petersen had a follow-up appointment scheduled for Sept. 30, 2020. *See* Petersen's Medical Records, Doc. No. 392-2, at 2.

10

incarceration." *Id.* Further, Petersen explains that his rehabilitation has been total. Petersen claims that he is now "more mature and more determined than he was when he last stood before the Court." *Id.* Petersen asserts that he has "maintained an excellent disciplinary record" in prison and poses no danger to the community. *Id.* at 17. Further, Petersen claims that his release plan "will ensure his continued success." *Id.* at 19. That release plan calls for Petersen to live in New Britain with his wife and young child. *See id.* Petersen will work at a landscaping company upon release and also continue his plumbing apprenticeship. *See id.* at 20. Petersen is also "eager to continue his substance abuse treatment under the purview of Probation." *Id.* Petersen reports that he is "interested in Support Court and/or Reentry Court." *Id.*

The government takes a different view. According to the government, Petersen has not established that "extraordinary and compelling reasons" warrant his release. *See* Gov't Opp'n, Doc. No. 388, at 9–15. The government notes that, although hypertension is a significant malady with respect to COVID-19, it does not constitute an "extraordinary and compelling reason" on the facts of this case. *See id.* at 9. First, the government points out that Petersen's hypertension diagnosis is very recent; indeed, it came after Petersen's request for a reduction in sentence to the BOP was denied in June of this year. *See id.* at 10. Medication was prescribed for the first time on August 25, 2020. *Id.* at 11. The government indicates that Petersen's BOP medical records do not reveal whether Petersen "continues to have any symptoms of hypertension, whether he is following the medication regimen and the effectiveness of that regimen." *Id.* "The overall picture that emerges from a review of the defendant's medical records is that he is stable and BOP is meeting his needs." *Id.* at 12. Thus, in the government's view, Petersen's case is different from cases in which courts have granted vulnerable inmates' motions for compassionate release. *See id.* at 12–13 (citing cases). In so arguing, the government distinguishes the cases

that Petersen asserts are analogous. *See id.* at 13.[6] Instead, the government cites numerous cases in which courts have "rejected hypertension, among other conditions, as a basis for release." *Id.* at 14–15 (citing cases).

The government articulates the ways in which the BOP is effectively managing the COVID-19 pandemic. *See id.* at 16–19. Indeed, at the time of the government's submission (Sept. 22, 2020), there were just two positive cases (both inmates) at FCI Danbury. *See id.* at 16. Today, there are seven positive cases (four inmates and three staff). *See COVID-19 Coronavirus*, FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last visited Dec. 3, 2020).

Finally, the government argues that the section 3553(a) factors "weigh heavily against release in this matter." *Id.* at 20. "The drug quantities involved here were staggering and the profit derived from trafficking those drugs was substantial." *Id.* In 2016 (the year of Petersen's arrest), there were 917 deaths from accidental overdoses in Connecticut. *See id.* Fentanyl was involved in 459 of those deaths. *See id.* And Xanax was involved in 232. *See id.* The government also doubts whether the period of incarceration that Petersen has already served would be sufficient to deter Petersen from returning to drug trafficking. The government points out that Petersen "dealt narcotics for a significant portion of his adult life, even during those brief

---

[6] I agree with the government that those cases are distinguishable. In *United States v. Sawicz*, the defendant had served virtually his entire sentence (he had been approved for release to a halfway house), and the outbreak at FCI Danbury at that time was severe. 453 F. Supp. 3d 601, 603 (E.D.N.Y. 2020). In *United States v. Guzman Soto*, the defendant had served 75 percent of a six-month sentence, and his prison facility was in the middle of a severe outbreak. 2020 WL 2104787, at *1–2 (D. Mass. May 1, 2020). In *United States v. Scparta*, the defendant was to be released in less than six months, the BOP had already decided to release the defendant to home confinement, and the defendant's prison was suffering from a severe outbreak. 2020 WL 1910481, at *1–2, *9 (S.D.N.Y. Apr. 20, 2020). In *Basank v. Decker*, the petitioners sought a writ of habeas corpus—not a compassionate release governed by section 3582(c)(1)(A). 449 F. Supp. 3d 205, 208 (S.D.N.Y. 2020). In *United States v. Pena*, the defendant was "eligible for release within one year," had "a number of serious medical issues," and was housed at a "site of a significant COVID-19 outbreak." 459 F. Supp. 3d 544, 546–47 (S.D.N.Y. 2020). In *United States v. Robinson*, the defendant had already served a decade in prison, which constituted over 90 percent of his sentence. 2020 WL 4041436, at *2, *7 (E.D. Va. July 17, 2020).

times that he held legitimate employment." *Id.* at 21. Further, as the government notes, Petersen was trafficking large quantities of drugs at the same time as he "had a state criminal sentence that included three years to serve hanging over him." *Id.* If Petersen is released, particularly into a world suffering from the effects of the COVID-19 pandemic, the government argues that "[h]e will be under significant financial stress," and so he may be especially tempted to return to the drug trade. *Id.* at 21–22. The fact that Petersen may be monitored electronically or on home incarceration does not significantly lessen that risk, in the government's view. *See id.* at 22.

    C. <u>I Will Not Reduce Petersen's Sentence.</u>

I will not reduce Petersen's sentence for two, independent reasons. First, Petersen has not shown that extraordinary and compelling reasons warrant his release. And, second, reducing Petersen's sentence would not comply with the purposes of sentencing as set forth in 18 U.S.C. § 3553(a).

    a. Extraordinary and Compelling Reasons

Petersen has not shown that "extraordinary and compelling reasons warrant" a reduction in his sentence. As noted above, such reasons may exist when an incarcerated defendant suffers from health conditions or other infirmities that make him particularly susceptible to serious complications should he contract COVID-19. *See Colvin*, 451 F. Supp. 3d at 241. I acknowledge that those—like Petersen—who suffer from hypertension may be at an increased risk for severe illness from COVID-19. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL AND PREVENTION (last updated Dec. 1, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.[7] It is true that some other courts have released inmates based, in part, on those

---

[7] According to the CDC, individuals suffering from pulmonary hypertension are at risk of severe illness from COVID-19. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL AND PREVENTION

13

inmates' hypertension.  *See, e.g.*, *United States v. Salvagno*, 456 F. Supp. 3d 420, 422 (N.D.N.Y. 2020).  I also acknowledge that, as a general matter, prisons and jails are among the most dangerous places to be during an epidemic.  *See United States v. Skelos*, 2020 WL 1847558, at *1 (S.D.N.Y. Apr. 12, 2020) ("Jails and prisons are powder kegs for infection."); *see also Covid-19's Impact on People in Prison*, EQUAL JUSTICE INITIATIVE (last updated Aug. 21, 2020), https://eji.org/news/covid-19s-impact-on-people-in-prison/.  I do not intend to minimize Petersen's elevated risk of severe illness should he contract COVID-19 or the severity of the COVID-19 pandemic.

Still, in determining whether "extraordinary and compelling reasons" warrant a prisoner's early release, courts routinely take into account the status of coronavirus infections at the particular institution where the defendant is housed.  *See, e.g.*, *United States v. Morales*, 2020 WL 4926609, at *3–4 (D. Conn. Aug. 20, 2020) (citing, *inter alia*, *United States v. Gagne*, 451 F. Supp. 3d 230, 235–36 (D. Conn. 2020); *United States v. Gamble*, 2020 WL 1955338, at *5 (D. Conn. Apr. 23, 2020)).  In this case, Petersen is housed at FCI Danbury.  Today, FCI Danbury has four inmates who have tested positive, three staff who has tested positive, 80 inmates who have recovered, and 65 staff who have recovered.  *See COVID-19 Coronavirus*, FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last visited Dec. 3, 2020).  Thus, the spread of COVID-19 at FCI Danbury is currently under control.  Indeed, several courts have recently denied motions for compassionate release made by inmates who are housed at FCI Danbury.  *See, e.g.*, *United States v. Newton*, 2020 WL 6784267, at *6 (D. Conn. Nov. 18, 2020) ("Conditions at FCI Danbury appear well controlled."); *United States v. German*, 2020 WL

---

(last updated Dec. 1, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.  In contrast, again according to the CDC, individuals suffering from essential hypertension (high blood pressure) may have an increased risk of severe illness from COVID-19.  *See id.*  Petersen has essential, not pulmonary, hypertension.  *See* Petersen's Medical Records, Doc. No. 392-2, at 3.

14

5849530, at *3 (D.N.H. Oct. 1, 2020) ("The BOP has a mitigation plan in place that appears largely successful in controlling the spread of the virus at FCI Danbury, given that there are currently only two confirmed cases of active COVID-19 at the facility."); *United States v. Ellis*, 2020 WL 5802312, at *2 (E.D.N.Y. Sept. 29, 2020) ("The record shows that FCI Danbury is strictly following all prevention protocols."); *United States v. Kelley*, 2020 WL 5665067, at *4 (S.D.W. Va. Sept. 22, 2020) ("Instead of alleging an inability of FCI Danbury to control the spread of COVID-19, Mr. Kelley has provided a detail that indicates that FCI Danbury is working hard to control the spread of COVID-19 within its walls.").

In addition, several courts have denied inmates' motions for compassionate release when the inmates' only asserted health condition is hypertension and the inmate has failed to show that the BOP's treatment was in some way inadequate. *See, e.g.*, *United States v. Ackerman*, 2020 WL 5017618, at *5 (E.D. Pa. Aug. 25, 2020) ("Where, as here, there is no indication that the defendant's hypertension cannot be properly controlled via medication or other appropriate medical care, courts routinely hold that compassionate release is not warranted."); *United States v. Thomas*, 2020 WL 3895781, at *4 (W.D. Va. July 10, 2020) ("Hypertension, or high blood pressure, a condition that the CDC estimates impacts 43.8% of the United States adult population, alone does not constitute an 'extraordinary and compelling reason.'"). I agree with those courts: On the facts of this case, Petersen's hypertension alone, without more, does not constitute an extraordinary and compelling reason warranting his release. *See* 18 U.S.C. § 3582(c)(1)(A).

      b.  Section 3553(a) Factors

Even if I were to hold that Petersen had shown extraordinary and compelling reasons warranting his release, I still would not grant Petersen's motion for compassionate release

15

because reducing Petersen's sentence to the time he has already served would not result in a sentence sufficient to achieve the purposes of sentencing. Pursuant to section 3553(a), I must impose a sentence that is sufficient, but not greater than necessary, to (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment, (2) afford adequate deterrence, (3) protect the public from further crimes of the defendant, and (4) provide the defendant with training, medical care, and other treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). I also must consider other factors, including the nature and circumstances of the offense and the history and characteristics of the defendant. *See id.* § 3553(a)(1).

At the sentencing hearing in this matter, I imposed the mandatory minimum sentence on Petersen. But I also commented on the seriousness of his offense. *See* Sentencing Tr., Doc. No. 317, at 24:24–25 ("[W]hat you did was very, very serious."); *id.* at 25:14–15 ("[W]hat you did was a very serious crime."). And I explained that people who dealt large quantities of fentanyl—like Petersen—needed to "serv[e] significant sentences." *Id.* at 25:10–11. The seriousness of Petersen's conduct has not changed since I sentenced him in 2017. And, in fact, the drug overdose crisis in this state has become more dire. According to the State of Connecticut's Office of the Chief Medical Examiner, 1200 individuals died in 2019 from accidental drug overdoses, and 979 of those deaths involved fentanyl. *See Statistics*, OFFICE OF THE CHIEF MED. EXAMINER, https://portal.ct.gov/OCME/Statistics (last visited Dec. 3, 2020) (navigate to the .pdf document entitled "Calendar Years 2012 to June 2020 Accidental Drug Intoxication"). Although there is no reason to conclude that Petersen is in any way linked to those deaths, Petersen helped grow the market for fentanyl in Connecticut. That market is now booming. Reducing Petersen's sentence to time served would not adequately reflect the seriousness of the offense, promote respect for the law, and provide just punishment. *See* 18 U.S.C. § 3553(a)(2)(A).

A longer sentence is also necessary to adequately deter Petersen from returning to drug dealing and to protect the public from Petersen's potential future drug dealing. *See id.* § 3553(a)(2)(B), (C). Petersen engaged in the drug dealing underlying this case while facing a potential three-year sentence for a conviction in state court. Similarly, then, Petersen may not be deterred by the possibility of the years of incarceration he would face if he violated the terms of his supervised release. Further, in his presentence interview, Petersen repeatedly mentioned that he dealt drugs for money because he felt pressure to support himself and several of his family members financially. *See, e.g.*, PSR, Doc. No. 253, at ¶¶ 19, 57, 65. Given COVID-19's devastating effect on the economy, that pressure might now be even greater. Thus, reducing Petersen's sentence to the time he has already served would, in my view, neither provide Petersen with adequate deterrence nor adequately protect the public from further of Petersen's crimes.

Although certain aspects of Petersen's personal history display promise—particularly his ability to maintain employment, *see* PSR, Doc. No. 253, at ¶¶ 61–66—I considered all of that information when crafting an appropriate sentence. The same goes for Petersen's troubled upbringing. I am also encouraged to learn that Petersen has "an excellent disciplinary record" thus far in prison and that Petersen is apparently taking advantage of substance abuse treatment within the BOP. *See* Petersen's Mem. of Law, Doc. No. 387-1, at 3, 17; PSR, Doc. No. 253, at ¶ 55. Petersen's apparent progress, though, is not enough to outweigh the seriousness of this offense, the need to deter Petersen from committing further crimes, and the need to protect the public.

### III.    Conclusion

For the foregoing reasons, Petersen's motion for release, doc. no. 387, is **denied**. Petersen's motion to seal his medical records, doc. no. 391, is **granted**.

IT IS SO ORDERED.

Dated at Bridgeport, Connecticut, this 3d day of December 2020.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge