UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>JARED McBRIARTY | No. 3:16-cr-109 (SRU) |

### ORDER

On April 18, 2017, McBriarty pleaded guilty (pursuant to a plea agreement) to count one of an indictment charging him with conspiracy to distribute, and to possess with intent to distribute, 400 grams or more of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(vi), and 846.  *See* Indictment, Doc. No. 18; Min. Entry, Doc. No. 172; Plea Agreement, Doc. No. 173.  On December 12, 2017, I held a sentencing hearing and sentenced McBriarty to the mandatory minimum 10 years' imprisonment and five years' supervised release.  *See* Min. Entry, Doc. No. 334; Judgment, Doc. No. 339 (entered on December 22, 2017).  McBriarty, who is 36 years old, is currently housed at the minimum-security satellite camp at the United States Penitentiary, Canaan ("USP Canaan Camp").  *See Find an Inmate*, FED. BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited Apr. 27, 2021).  McBriarty's scheduled release date is June 21, 2026.  *See id.*  He has been incarcerated since his self-surrender on January 23, 2018.  McBriarty has thus served about 39 months in prison, which is approximately 40 percent of his sentence (accounting for good-time credit).

On January 25, 2021, McBriarty (through counsel) filed a motion for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), as amended in 2018 by the First Step Act.  *See* Mot. for Sentence Reduction, Doc. No. 404.  McBriarty contends that "extraordinary and compelling reasons" warrant reducing his sentence either to time served or to some shorter

period of incarceration. In particular, McBriarty seeks relief based on "(a) his family circumstances and the need for his presence at home," "(b) the growing COVID-19 pandemic, which has made McBriarty's sentence much more punitive than intended," "(c) McBriarty's medical conditions, including obesity, history of tobacco use, high blood pressure readings, and the need for corticosteroids, which render him especially vulnerable to serious illness or death if infected with COVID-19," (d) "the amount of time he has already served and the fact that the Court was constrained by the mandatory minimum at the time of his original sentencing"; (e) "his extraordinary rehabilitation and his pristine disciplinary record while in prison," and (f) "the 18 U.S.C. § 3553(a) factors as applied in his particular case." Mem. of Law in Supp. Mot. for Sentence Reduction ("McBriarty's Mem. of Law"), Doc. No. 405, at 1. McBriarty also filed relevant medical records. *See* Mot. to Seal, Doc. No. 406; McBriarty's Medical Records, Exs. A and B to McBriarty's Mem. of Law, Doc. Nos. 407-1 and 407-2. On February 26, 2021, the government filed an opposition. *See* Gov't Opp'n, Doc. No. 411. The government argues that (1) McBriarty has not established that extraordinary and compelling reasons warrant a sentence reduction, and (2) the section 3553(a) sentencing factors weigh against a sentence reduction. *See id.* at 8–21. On March 3, 2021, McBriarty filed a reply. *See* McBriarty's Reply, Doc. No. 413.[1]

For the following reasons, I **deny** McBriarty's motion for relief and decline to alter his sentence.

I.   **Standard of Review**

The First Step Act of 2018 (the "FSA") amended the language of section 3582(c)(1)(A). Before the FSA, only the Director of the Bureau of Prisons (the "BOP") could make a motion for the court to reduce a defendant's sentence based on extraordinary and compelling reasons. It is

---

[1]   McBriarty's reply was erroneously docketed as a sentencing memorandum.

widely acknowledged that the BOP fell short in its gatekeeper role and that, as a result, too few inmates were granted compassionate release. *See, e.g.*, U.S. Dep't of Justice, Office of the Inspector General, Evaluation and Inspections Division, *The Federal Bureau of Prisons' Compassionate Release Program* i (April 2013), https://oig.justice.gov/reports/2013/e1306.pdf ("[W]e found that the existing BOP compassionate release program has been poorly managed and implemented inconsistently, likely resulting in eligible inmates not being considered for release and in terminally ill inmates dying before their requests were decided."); Shon Hopwood, *Second Looks & Second Chances*, 41 CARDOZO L. REV. 83, 105–06 (2019); William W. Berry III, *Extraordinary and Compelling: A Re-Examination of the Justifications for Compassionate Release*, 68 MD. L. REV. 850, 868 (2009) (noting that, in the 1990s, 0.01 percent of inmates annually were granted compassionate release).

Congress passed the FSA against that backdrop. The FSA altered section 3582(c)(1)(A), in part, to increase the use of compassionate release. *See* 164 Cong. Rec. H10358 (daily ed. Dec. 20, 2018) (titling changes to section 3582(c)(1)(A) as "Increasing the Use and Transparency of Compassionate Release"). In particular, the FSA amended section 3582(c)(1)(A) to allow a defendant him- or herself to bring a motion for compassionate release. Section 3582(c) now reads, in relevant part:

> (c) Modification of an imposed term of imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that – (1) in any case –
>
> > (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after

> considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that –
>
> > (i) extraordinary and compelling reasons warrant such a reduction; . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Until recently, I (and many other district courts around the country) interpreted the "applicable policy statement[] issued by the Sentencing Commission" to be U.S.S.G. § 1B1.13. *See, e.g.*, *United States v. Almontes*, 2020 WL 1812713, at *2 (D. Conn. Apr. 9, 2020).

However, in September 2020, the Second Circuit clarified that section 1B1.13 is *not applicable* to compassionate release motions brought by defendants themselves. *See United States v. Brooker*, 976 F.3d 228, 236 (2d Cir. 2020). Since the Second Circuit decided *Brooker*, several courts of appeals in other circuits have concurred that section 1B1.13 is not applicable to compassionate release motions brought by defendants. *See United States v. McCoy*, 981 F.3d 271, 281 (4th Cir. 2020); *United States v. Shkambi*, 2021 WL 1291609, at *4 (5th Cir. Apr. 7, 2021); *United States v. Jones*, 980 F.3d 1098, 1101 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020); *United States v. Aruda*, 2021 WL 1307884, at *4 (9th Cir. Apr. 8, 2021); *United States v. McGee*, 992 F.3d 1035, 1050 (10th Cir. 2021). Because in this case McBriarty himself made a motion for compassionate release, I may "consider the full slate of extraordinary and compelling reasons," and nothing in the "now-outdated version" of section 1B1.13 limits my discretion. *Brooker*, 976 F.3d at 237.

The defendant bears the burden of proving that he is entitled to a sentence reduction. *See United States v. Morales*, 2020 WL 2097630, at *2 (D. Conn. May 1, 2020). Courts "have broad discretion in deciding whether to grant or deny a motion for a sentence reduction." *United States v. Jones*, 2020 WL 2782395, at *2 (D. Conn. May 29, 2020) (quoting *United States v.*

*Tagliaferri*, 2019 WL 6307494, at *3 (S.D.N.Y. Nov. 25, 2019)). Indeed, section 3582(c)(1)(A) grants a district court permissive authority to reduce an inmate's sentence under certain conditions. *See* 18 U.S.C. § 3582(c)(1)(A) ("[T]he court . . . may reduce the term of imprisonment . . . ."). A court may not reduce a term of imprisonment without "considering the factors set forth in section 3553(a) to the extent that they are applicable." *Id.*; *see also United States v. Torres*, 464 F. Supp. 3d 651, 658 (S.D.N.Y. 2020) (explaining that courts must consider section 3553(a) factors before granting a sentence reduction pursuant to section 3582(c)(1)(A)).

## II. Discussion

### A. Background

McBriarty was arrested on May 19, 2016. *See* PSR, Doc. No. 229, at 1. The same day, law enforcement officers executed a search warrant at McBriarty's residence in Bristol, Connecticut. *See id.* at ¶ 16. There, officers seized "various quantities" of marijuana, Xanax, and "suspected MDMA." *Id.* Officers also found "a fully loaded handgun on a closet shelf." *Id.* McBriarty's arrest followed a nearly six-month investigation into his (and his co-defendants') drug trafficking activities. *See id.* at ¶¶ 9–16. That investigation included the use of both a wiretap and a confidential source, who conducted several controlled purchases. *See id.* The investigation revealed that McBriarty's "relevant and readily foreseeable conduct involve[d] 2.5 kilograms of fentanyl, 2 kilograms of MDMA, and 50,000 units of a Schedule IV controlled substance (Xanax)." *Id.* at ¶ 4; *see also* Plea Agreement, Doc. No. 173, at 3 (drug quantity stipulation).

McBriarty grew up in difficult circumstances. McBriarty's parents "truly hated one another" and separated when McBriarty was about 10. PSR, Doc. No. 229, at ¶ 49. McBriarty did not have many positive role models: His father was "extremely physical[ly] and verbally

5

abusive," and "a great majority of his maternal relatives are drug addicts." *Id.* at ¶ 50. McBriarty's father also used to call him "dumber than a bag of rocks." *Id.* at ¶ 55. After moving out of his father's house at age 16, McBriarty moved in with his mother. *Id.* at ¶ 56. Although McBriarty began using drugs at age 11, "it was when he moved in with his mother [that] he started using more frequently." *Id.* at ¶ 55.

Unfortunately, McBriarty has a long history of substance abuse issues. McBriarty began drinking alcohol at age 10, and, by age 16, he was drinking a "few times a week." *Id.* at ¶ 64. At age 11, McBriarty first began smoking marijuana. By age 16, he was smoking every day. *Id.* Around age 16, McBriarty also began using cocaine regularly. *Id.* Throughout his teens and twenties, McBriarty used a host of other drugs. *Id.* at ¶¶ 65–66. However, McBriarty apparently stopped cold turkey when he was arrested in May 2016. *Id.* at ¶ 69. While on pretrial release, McBriarty got "very involved in Narcotics Anonymous" and reported that he "genuinely enjoy[ed] attending Narcotics Anonymous meetings." *Id.* at ¶¶ 69, 72. (As discussed below, McBriarty maintains that involvement to this day.)

Despite McBriarty's significant substance abuse issues, he was able to work continuously from 2008 until his arrest. *Id.* at ¶¶ 77–80. While on pretrial release in this case, McBriarty obtained a union job, in which he worked 40 hours per week and earned nearly $30 per hour. *Id.* at ¶ 76.

At sentencing, McBriarty faced a Guidelines range of 135 to 168 months' imprisonment. *See id.* at ¶ 87. However, the government agreed as part of the plea agreement not to seek a sentence longer than the mandatory minimum of 10 years. *See* Plea Agreement, Doc. No. 173, at 4. Based primarily on McBriarty's conduct while on pretrial release, I agreed that the mandatory minimum—which resulted in a below-Guidelines sentence—was appropriate in this case. I said:

> Well, Mr. McBriarty, it's unfortunate that your wakeup call was so loud. You know, many people who become involved in drugs have a wakeup call that doesn't require them to serve a mandatory minimum of ten years, and unfortunately that's where you are. That's where you are because, as Mr. Vatti said, what you were doing was quite serious; but to be completely frank, ten years is probably more than I would have given you if I had the choice.
>
> I have seen, from what's been presented, the strides you've made from a very low place. You've become sober. You've remained sober. You've become active in [Narcotics Anonymous]. You've held down a very good job. You know, I see people who sometimes have jobs, but they're often minimum wage jobs, and you had a job that is one that probably could easily support a family. So I think that's significant, and it gives me hope for your future.
>
> I don't expect you to come back and make this mistake again. I think you've learned your lesson. I think you realize the impact of your actions on not just yourself but also on your family. And the bottom line, I think that the mandatory minimum is the appropriate sentence in this case.
>
> . . .
>
> Well, Mr. McBriarty, in closing, I just want to wish you good luck. It's always encouraging, frankly, when somebody has found a way to turn their life around to overcome their addiction and to become a productive member but also, frankly, a loving member of society. You know, you can't care for others when you're a drug addict because all you care about is the drug, and so now that you've gotten over that, I expect you're going to be a better person, and I hope that you have many, many years with your family after your release, and I wish you and them the best of luck.

Sentencing Hr'g Tr., Doc. No. 354, at 14:3–24, 21:13–23.

### B. Parties' Arguments[2]

McBriarty argues that extraordinary and compelling reasons warrant his release, or at least a reduction in his sentence. First, McBriarty focuses on his family circumstances. McBriarty's mother suffers from "spinal stenosis, arthritis, and chronic pain." McBriarty's Mem. of Law, Doc. No. 405, at 5; *see also* McBriarty's Mother's Medical Records, Ex. D to

---

[2] The parties agree that McBriarty has satisfied section 3582(c)(1)(A)'s exhaustion requirement. *See* McBriarty's Mem. of Law, Doc. No. 405, at 3, 29; BOP Records, Ex. H to McBriarty's Mem. of Law, Doc. No. 405-5; Gov't Opp'n, Doc. No. 411, at 8.

McBriarty's Mem. of Law, Doc. No. 407-3 (sealed). In the past several years, McBriarty's mother has had multiple medical procedures—*e.g.*, hip replacements, cervical spine surgery, and rotator cuff surgery—but still feels significant pain and has difficulty performing routine activities of daily life. *Id.* McBriarty's mother reports that she cannot rely on anyone for help because her children are "either too far away and/or are consumed with their own substance abuse issues." McBriarty's Mem. of Law, Doc. No. 405, at 10; McBriarty's Mother's Letter, Ex. E to McBriarty's Mem. of Law, Doc. No. 405-2. In addition, McBriarty explains that he has not seen his six-year-old son since February 2020. McBriarty's Mem. of Law, Doc. No. 405, at 5. McBriarty's son is "struggling without his father," and their "separation is manifesting itself in behavioral issues at home." *Id.* McBriarty explains that if he "were to be released early, he would reside with his mother and take care of her," and McBriarty's son "would reside with him 4 nights per week." *Id.*

Second, McBriarty focuses on his vulnerability to COVID-19. *See id.* at 11–23. McBriarty reports that he has several medical conditions that place him at a higher risk for serious illness should he contract COVID-19. More specifically, McBriarty claims that he is obese, with a BMI of 31; has recently exhibited high blood pressure readings; takes corticosteroids; and smoked tobacco for 17 years. *See id.* at 15–22; McBriarty's Medical Records, Doc. Nos. 407-1 and 407-2; McBriarty's Email, Ex. K to McBriarty's Mem. of Law, Doc. No. 405-8.

Third, McBriarty notes that he is unable to "take the necessary precautions to safeguard himself" at the USP Canaan Camp. McBriarty's Mem. of Law, Doc. No. 405, at 22. When

McBriarty submitted his motion (Jan. 25, 2021), there were 31 active cases at the UPS Canaan Camp.  *See id.*³

Fourth, McBriarty argues that because of restrictions necessitated by the COVID-19 pandemic, his incarceration has been "much more punitive than anticipated."  *Id.* at 23.  McBriarty cites several cases in which courts have reduced inmates' sentences based on the unanticipated harshness of their confinement.  *See United States v. Rodriguez*, 492 F. Supp. 3d 306 (S.D.N.Y. 2020); *United States v. Lizardi*, 2020 U.S. Dist. LEXIS 188147 (S.D.N.Y. Oct. 9, 2020); *United States v. Henareh*, 2021 WL 119016 (S.D.N.Y. Jan. 13, 2021).

Fifth, McBriarty focuses on his stellar prison conduct and continued rehabilitation.  *See* McBriarty's Mem. of Law, Doc. No. 405, at 4.  McBriarty has amassed zero disciplinary citations and leads a Narcotics Anonymous class and a Bible study and prayer group at the USP Canaan Camp.  *Id.*

Finally, McBriarty argues that the section 3553(a) sentencing factors weigh in favor of a reduction in sentence.  McBriarty points especially to his rehabilitation:  At the USP Canaan Camp, McBriarty has no disciplinary infractions, has stayed employed, and "leads groups in Narcotics Anonymous and in Bible study."  *Id.* at 27.  McBriarty posits that his 10-year sentence is "longer than necessary to reflect the seriousness of the offense and to punish" him.  *Id.* at 28.  McBriarty also claims that he is unlikely to recidivate and will not be a danger to society because he is "about to turn 36 years old," "has been a model prisoner" in several ways, and "will be a live-in caretaker for his mother."  *Id.* at 28–29.  McBriarty focuses on his solid release plan:  He has multiple job offers and plans to "regain his union construction job," "reside with hi[s]

---

³   By the time the government submitted its opposition (Feb. 26), there were no active cases, and today there are four (all staff).  *See COVID-19 Coronavirus*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited Apr. 27, 2021).

9

mother," "resume the visitation schedule he had with his son on pretrial release," and "continue to participate in Narcotics Anonymous." *Id.* at 29.

The government takes a different view. First, the government argues that McBriarty has not established that extraordinary and compelling reasons warrant his release. Most importantly, McBriarty received the first dose of the Pfizer-BioNTech COVID-19 vaccine on February 9, 2021, and was scheduled to receive the second dose in the first week of March. *See* BOP Health Record, Ex. 1 to Gov't Opp'n, Doc. No. 411-1. Once fully vaccinated, McBriarty will be "no longer at risk for serious illness from Covid-19." Gov't Opp'n, Doc. No. 411, at 9–12. The government also challenges McBriarty's assertion that his carceral sentence has been unduly punitive: Tight BOP restrictions have been necessary to address the spread of COVID-19, and, despite the restrictions, McBriarty has clearly "been able to continue certain programming," such as Bible study and Narcotics Anonymous meetings. *Id.* at 12. Further, restrictions will soon loosen, in the government's view. In fact, vaccinations have now been offered to all inmates at the USP Canaan Camp. *See id.* at 13. Finally, the government contests McBriarty's claim that his rehabilitation and family circumstances warrant a reduction in sentence. *See id.* at 14–15. The government argues that, in granting McBriarty a below-Guidelines, mandatory-minimum sentence, I already considered McBriarty's rehabilitation and positive trajectory. *See id.* And, "though the defendant's mother's health is poor, she is apparently currently able to care for herself, though she does experience daily pain." *Id.* at 15.

Second, the government argues that the section 3553(a) sentencing factors counsel against reducing McBriarty's sentence. The government emphasizes the seriousness of this offense and the need to deter McBriarty and others who would deal fentanyl. *See id.* at 17–18. The government also notes McBriarty's risk of recidivism. For instance, although McBriarty

10

indicates that he has a decent job waiting for him upon release, McBriarty was doing fairly well financially through legitimate economic means at the time of his criminal conduct in this case. *See id.* at 18; *see also* PSR, Doc. No. 229, at ¶¶ 76–80, 82–85 (detailing employment history and financial condition). Similarly, given that McBriarty's substance abuse issues worsened when he moved into his mother's house at age 16, it does not inspire confidence that he proposes returning there. *See* Gov't Opp'n, Doc. No. 411, at 19; PSR. Doc. No. 229, at ¶ 55 ("[H]e indicated it was when he moved in with his mother [that] he started using more frequently."). Finally, the government argues that a reduction in sentence for McBriarty "would create a substantial sentencing disparity with other similarly situated defendants," including McBriarty's co-defendant Kyle Petersen, whose motion for a reduction in sentence I recently denied. *See* Gov't Opp'n, Doc. No. 411, at 20; *see also United States v. Petersen*, 2020 WL 7129705 (D. Conn. Dec. 3, 2020) ("*Petersen I*"); *United States v. Petersen*, 2021 WL 217425 (D. Conn. Jan. 21, 2021) ("*Petersen II*").

In reply, McBriarty challenges the government's arguments and characterizations. Regarding the vaccine, McBriarty claims that the government "oversells its effect." McBriarty's Reply, Doc. No. 413, at 2. According to McBriarty, the Pfizer vaccine will "hopefully inhibit [COVID-19's] transmission." *Id.* "But it has only been available for a couple of months, and it is far too early, especially with the emerging variants of the virus, to declare that the risks of the pandemic are over." *Id.* Relatedly, the vaccines might have limited effectiveness in prisons, where many prisoners and prison staff have refused the vaccine. *See id.* at 3 (reporting, by way of example, that at FCI Danbury, some 40 percent of inmates apparently refused the vaccine). Regarding his release plan, McBriarty explains that the government's concerns are illusory. Although true that his mother's home was an unhealthy environment for McBriarty when he was

16 years old, "[t]hat was 20 years ago." *Id.* at 2. In the interim, McBriarty's step-father and maternal uncle, who both had substance abuse issues, have either died or moved away. *See id.*

C. Evaluation

Although it is a relatively close call, I will not reduce McBriarty's sentence because he has not established that extraordinary and compelling reasons warrant such a reduction, and, in any event, doing so would not comply with the purposes of sentencing as set forth in 18 U.S.C. § 3553(a).

    a. Extraordinary and Compelling Reasons

Given that McBriarty has now been vaccinated,[4] his purported underlying medical conditions—obesity, high blood pressure, a history of smoking tobacco, and use of a corticosteroid—do not help constitute an extraordinary and compelling reason warranting relief.[5] Given current understanding, the Pfizer vaccine is so effective at preventing serious illness from

---

[4] Although the government has not provided an update confirming that McBriarty received a second dose of the Pfizer vaccine as scheduled, I assume for purposes of this ruling that McBriarty did receive that dose.

[5] Although I need not reach the question, I note that—even before McBriarty received the vaccine—it is unclear whether McBriarty's underlying medical conditions would help constitute an extraordinary and compelling reason warranting a reduction in sentence. For instance, McBriarty's claim with respect to his obesity appears weak. McBriarty's BMI is very close to 30, and it has recently fluctuated both above and below that line. *See* PSR, Doc. No. 229, at ¶ 62 (indicating, in June 2017, height of 5 feet 10 inches and weight of 180 pounds, yielding BMI of 25.8, which is overweight, but not obese); McBriarty's Medical Records, Doc. No. 407-1, at 29–30 (on Jan. 15, 2019, BMI of 30); McBriarty's Medical Records, Doc. No. 407-2, at 11 (on Aug. 31, 2020, BMI of 27.1); *id.* at 64–65 (on Jan. 2, 2021, BMI of 31); *see also Adult BMI Calculator*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html (used for all BMI calculations) (last visited Apr. 27, 2021). As I have explained elsewhere, a BMI "only slightly over the at-risk threshold of 30" might not "count significantly in the defendant's favor in determining whether extraordinary and compelling reasons warrant that defendant's release," especially if "there is no evidence that that obesity causes the defendant health problems." *United States v. Gonzalez*, 2021 WL 681142, at *10 (D. Conn. Feb. 22, 2021) (cleaned up).
    McBriarty's claim regarding his high blood pressure also appears weak. McBriarty does not claim that he has been diagnosed with (or is taking medication for) hypertension. Rather, McBriarty simply claims that in August 2020 and January 2021 he had two high blood pressure readings. *See* McBriarty's Mem. of Law, Doc. No. 405, at 15; *see also* McBriarty's Medical Records, Doc. No. 407-2, at 11 (143/85 on Aug. 31, 2020); *id.* at 2 (154/93 on Jan. 10, 2021). McBriarty has also had less concerning blood pressure readings in his recent medical history. *See* McBriarty's Medical Records, Doc. No. 407-1, at 24 (105/69 on Jan. 18, 2019); *id.* at 29 (117/64 on Jan. 15, 2019); McBriarty's Medical Records, Doc. No. 407-2, at 22 (135/95 on May 21, 2020). In any event, as I have explained elsewhere, even if McBriarty did have hypertension, that would not weigh significantly in his favor because he has not shown that the BOP's treatment was in some way inadequate. *See Gonzalez*, 2021 WL 681142, at *10; *Petersen I*, 2020 WL 7129705, at *8.

COVID-19 that the threat of McBriarty's becoming seriously ill is miniscule—and certainly not extraordinary and compelling. *See Pfizer-BioNTech COVID-19 Vaccine Overview and Safety*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/Pfizer-BioNTech.html (last updated Apr. 16, 2021) (explaining that the vaccine is "95% effective at preventing laboratory-confirmed COVID-19 illness in people without evidence of previous infection"); *United States v. Cortez*, 2021 WL 689923, at *1 (D. Ariz. Feb. 23, 2021); *United States v. Singh*, 2021 WL 928740, at *3 n.36 (M.D. Pa. Mar. 11, 2021) (citing cases in which courts have denied motions for sentence reductions made by inmates who have access to vaccine). McBriarty's arguments to the contrary—which focus on "[t]he emergence of troubling variants" and the possibility that many inmates and guards will refuse the vaccine, *see* McBriarty's Reply, Doc. No. 413, at 2–3—are speculative and unpersuasive.

Although McBriarty's other arguments for relief—particularly, his rehabilitation and his family circumstances—are not trivial, they neither individually nor collectively help constitute an extraordinary and compelling reason warranting a reduction in sentence.

Take rehabilitation first. Courts routinely focus on a defendant's rehabilitation as one (non-dispositive) factor contributing to extraordinary and compelling reasons. *See, e.g.*, *Rodriguez*, 492 F. Supp. 3d at 311; *United States v. Millan*, 2020 WL 1674058, at *7 (S.D.N.Y. Apr. 6, 2020); 28 U.S.C. § 994(t) (providing that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason"). I applaud McBriarty for his clean conduct in prison and the concrete steps he is taking to better himself, including by leading Narcotics Anonymous and Bible study and prayer groups. It appears that McBriarty is positively impacting both his own life and the lives of his fellow inmates. *See* Letters, Ex. G to

13

McBriarty's Mem. of Law, Doc. No. 405-4, at 4–5, 14 (three letters from fellow prisoners detailing McBriarty's positive effect on them). However, I note that McBriarty's rehabilitation—particularly his commendable involvement in Narcotics Anonymous—began in earnest well before I sentenced him, while he was on pretrial release. *See id.* at 2–3, 6–13, 15–17 (letters from individuals who knew McBriarty before his incarceration, including several who met him through participation in Narcotics Anonymous). As described above, I considered McBriarty's positive path in imposing a below-Guidelines sentence. *See* Sentencing Tr., Doc. No. 354, at 14:11–18 ("I have seen, from what's been presented, the strides you've made from a very low place. You've become sober. You've remained sober. You've become active in N.A. You've held down a very good job . . . . So I think that's significant, and it gives me hope for your future."); *id.* at 21:14–17 ("It's always encouraging, frankly, when somebody has found a way to turn their life around to overcome their addiction and to become a productive member but also, frankly, a loving member of society."); Judgment, Doc. No. 339, at 1 (explaining that McBriarty's sentence "reflects McBriarty's positive conduct while on pretrial supervision, his active participation in substance abuse treatment, and his sincere remorse for his involvement in the offense."). I again commend McBriarty on his rehabilitative progress and success. However, McBriarty's continued rehabilitation does not significantly contribute to an extraordinary and compelling reason warranting a reduction in his sentence.

Although McBriarty's family circumstances are unfortunate, they also do not rise to the level of an extraordinary and compelling reason. I do not doubt that McBriarty's mother and son are both enduring difficult times.[6] Sadly, though, McBriarty's family members' experiences are

---

[6] I accept that McBriarty's mother currently has difficulty with everyday tasks—such as "cleaning, cooking, and laundry"—because of her "[d]egenerative [a]rthritis, [a]sthma, chronic pain syndrome, and spinal stenosis." McBriarty's Mother's Letter, Doc. No. 405-2, at 2; *see also* McBriarty's Mother's Medical Records, Doc. No. 407-3 (sealed). I also accept that McBriarty's six-year-old son is suffering from not seeing McBriarty and that he may be

14

not necessarily atypical.  Many federal inmates are young men.  *See Inmate Age*, FED. BUREAU OF PRISONS, https://www.bop.gov/about/statistics/statistics_inmate_age.jsp (last updated Apr. 17, 2021) (reporting that 47 percent of federal prisoners are between ages 26 and 40); *Inmate Gender*, FED. BUREAU OF PRISONS, https://www.bop.gov/about/statistics/statistics_inmate_gender.jsp (last updated Apr. 17, 2021) (reporting that 93.3 percent of federal inmates are male).  Of course, many of those inmates have aging parents and/or young children.  *Cf. Henareh*, 2021 WL 119016, at *4 ("[W]hen someone commits a serious crime and is caught, the felon's family members are almost always among the primary victims of the result of his misconduct and suffer both financially and psychologically.").  When McBriarty committed the instant crime, his son was a preschooler, and his mother was creeping towards old age.  It is unsurprising[7]—and certainly not extraordinary—that McBriarty's young son would benefit from seeing his father more, or that McBriarty's mother would benefit from McBriarty's help as she ages.

The closest issue regards McBriarty's mother's health, which appears to have declined since McBriarty has been incarcerated.  Congress and courts have recognized that the incapacitation of a close family member can, under certain circumstances, amount to an extraordinary and compelling reason warranting a reduction in sentence.  *See* U.S.S.G. § 1B1.13 cmt. n.1(C)(ii) (indicating that the "incapacitation of the defendant's spouse or registered partner" would amount to "extraordinary and compelling reasons" when the defendant would be "the only available caregiver for the spouse or registered partner");[8] *United States v. Wooten*,

---

"showing signs of Terrets [*sic*] Syndrome, and ADHD, . . . [which] are leading to behavioral issues." McBriarty's Letter, Doc. No. 405-6.

[7]  Indeed, McBriarty admits as much.  *See* McBriarty's Letter, Doc. No. 405-6 ("I knew a day would come where my mother would require [] care from me . . . .").

[8]  Of course, I am no longer bound by the now-outdated version of section 1B1.13.  *See Brooker*, 976 F.3d at 236.

2020 WL 6119321, at *4 (D. Conn. Oct. 16, 2020) (holding that the incapacitated family member may be someone other than a spouse or registered partner).  However, I agree with the many courts that have denied inmates' requests for release based on the incapacitation of a close family member when that inmate has not established that he is the *only* available caregiver for that close family member.  *See, e.g.*, *United States v. Pabon*, 2021 WL 603269, at *4 (S.D.N.Y. Feb. 16, 2021); *United States v. Lindsey*, 2021 WL 37688, at *3 (S.D.N.Y. Jan. 4, 2021); *United States v. Crandle*, 2020 WL 2188865, at *4 (M.D. La. May 6, 2020); *United States v. Moore*, 2020 WL 7024245, at *4–5 (E.D. Pa. Nov. 30, 2020).

Although it seems that McBriarty may be the *best* available caregiver for his ailing mother, he is not her *only* available caregiver.  Most obviously, McBriarty has several siblings and half-siblings who live in Connecticut.  *See* PSR, Doc. No. 229, at ¶¶ 48–49 (describing McBriarty's two brothers and two maternal half-siblings, three of whom lived in Connecticut at the time of the PSR).  In a letter to me, McBriarty's mother's acknowledges that several of her children live nearby.  However, McBriarty's mother claims, none of those children can help care for her because each has his or her own problems.  McBrairty's mother explains:

- "I had my son Colin shopping for me and helping me, [but] because of his addiction issues he wasn't reliable.  He couldn't be trusted after he stole my car and other things.  He has been incarcerated since January 6th 2020, so I don't have him anymore."

- "My son Kyle lives and works in Florida so he can't help."

- "My son Joshua lives almost an hour away with his girlfriend, two children and his girlfriend's parents.  The mother has dementia and the father works 2nd shift so he has to help out in the house.  He also has issues with drinking and other addictions so driving here is not an option."

- "My daughter lives about 35 minutes away with her boyfriend and three children.  We don't speak and she has a lot going on with her life dealing with her own problems."

- "My mother has leukemia and doesn't leave the house much, especially with the covid, she can't take the chance of getting sick."

McBriarty's Mother's Letter, Doc. No. 405-2. McBriarty echoes his mother's arguments. *See* McBriarty Letter, Doc. No. 405-6 (explaining that "as the oldest son, I have always been the only child to care for my mother," and that "unfortunately, my siblings are still grappling with many of the substance abuse issues that once controlled me and as a result they are unable to care for my mother").

As the foregoing illustrates, McBriarty's mother has several children and a parent who live nearby. Although, sadly, each seems to have his or her own issues, they are still "available" caretakers. If released, McBriarty might be the best available caretaker for his mother, but he would not be her only available caretaker. Thus, McBriarty's mother's condition does not constitute an extraordinary and compelling reason warranting a reduction in his sentence.[9]

  b. Section 3553(a) Factors

Even if I were to hold that McBriarty had shown extraordinary and compelling reasons warranting relief, I would not reduce McBriarty's sentence because doing so would not result in a sentence sufficient to achieve the purposes of sentencing. Pursuant to section 3553(a), I must impose a sentence that is sufficient, but not greater than necessary, to (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment, (2) afford adequate

---

[9] As McBriarty points out, I have granted compassionate release to a defendant based, in part, on that defendant's role as the only available caregiver for his mother and sister. *See Wooten*, 2020 WL 6119321, at *7. In *Wooten*, I explained that "no single factor in Wooten's case amounts to an 'extraordinary and compelling reason' warranting his release," but that a combination of factors added up to such a reason. *Id.* First, and most important, was "Wooten's status as the only available caregiver for his aging mother and disabled sister." *Id.* Second, Wooten was "quite near the end of his sentence"—he had served about 90 percent of it. *Id.* at *8. Third, Wooten would have already been released "had the government not required his testimony in a federal grand jury investigation" because he had been on track to earn one year off his sentence through his participation in the BOP's Residential Drug Abuse Treatment Program. *Id.* This case is unlike *Wooten* for two important reasons. Whereas McBriarty has served under half of his sentence, Wooten had served 90 percent of his. And whereas McBriarty is one of several available caregivers for his mother, Wooten was the only available caregiver for his disabled sister and aging mother.

deterrence, (3) protect the public from further crimes of the defendant, and (4) provide the defendant with training, medical care, and other treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). I must also consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *Id.* § 3553(a)(6). I must also examine other factors, including the nature and circumstances of the offense and the history and characteristics of the defendant. *See id.* § 3553(a)(1).

To be sure, several of the section 3553(a) factors cut in McBriarty's favor. For the reasons already discussed, the time that McBriarty has already served in prison might be sufficient to achieve some purposes of sentencing, such as providing adequate specific deterrence, protecting the public, and facilitating rehabilitation. As I remarked at McBriarty's sentencing—and reiterate now—I do not "expect [McBriarty] to come back and make this mistake again." Sentencing Hr'g Tr., Doc. No. 354, at 14:19–20.

However, a sentence shorter than 10 years would be insufficient to achieve other purposes of sentencing. More specifically, a sentence reduction would not adequately reflect the seriousness of McBriarty's offense, provide just punishment, promote respect for the law, or provide adequate general deterrence. McBriarty was involved in a conspiracy to distribute huge quantities (2.5 kilograms) of fentanyl. *See* Plea Agreement, Doc. No. 173, at 3. The seriousness of McBriarty's conduct has not changed since I sentenced him in 2017. In fact, the drug overdose crisis in this state has become more dire. According to the State of Connecticut's Office of the Chief Medical Examiner, 1374 individuals died in 2020 from accidental drug overdoses, and 1159 of those deaths involved fentanyl. *See Statistics*, OFFICE OF THE CHIEF MED. EXAMINER, https://portal.ct.gov/OCME/Statistics (last visited Apr. 27, 2021) (navigate to the .pdf document entitled "Calendar Years 2012 to 2020 Accidental Drug Intoxication").

Although there is no reason to conclude that McBriarty is in any way linked to those deaths, it is important that McBriarty helped grow the market for fentanyl in Connecticut. That market is now booming. Reducing McBriarty's sentence would not adequately reflect the seriousness of the offense, promote respect for the law, and provide just punishment. *See* 18 U.S.C. § 3553(a)(2)(A).

It is also significant that officers found a loaded handgun when searching McBriarty's residence at the time of his arrest. At that time, McBriarty's son—who was approximately three years old—must have been in that residence frequently. It was incredibly dangerous and reckless for McBriarty to keep a loaded firearm in such a residence.

Finally, I recently denied a motion for release made by one of McBriarty's co-conspirators: Kyle Petersen. *See Petersen I*, 2020 WL 7129705, at *1; *Petersen II*, 2021 WL 217425, at *1. I agree with the government that McBriarty's criminal conduct was at least as serious as Petersen's; indeed, McBriarty was indisputably Petersen's supplier. *See* Gov't Opp'n, Doc. No. 411, at 4, 20; PSR, Doc. No. 229, at ¶ 15. Also, law enforcement officers found a firearm when searching McBriarty's residence, but not when searching Petersen's residence. In any event, because Petersen is still serving a ten-year mandatory minimum sentence, reducing McBriarty's sentence might result in an "unwarranted sentencing disparit[y]" between McBriarty and Petersen, who are defendants with "similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

### III. Conclusion

For the foregoing reasons, McBriarty's motion for release or a reduction in sentence, doc. no. 404, is **denied**. McBriarty's motion to seal, doc. no. 406, is **granted**.

IT IS SO ORDERED.

Dated at Bridgeport, Connecticut, this 27th day of April 2021.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge